## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ALFRED ALLEN, JR.                    :

                                     :

                                     :

      v.                                :        Civil No. CCB-13-3075

                                     :

                                     :

BALTIMORE COUNTY, MARYLAND           :

## **MEMORANDUM**

     Alfred Allen, Jr. filed this lawsuit against Baltimore County ("County") for alleged

violations of the Americans with Disabilities Act ("ADA").  Allen claims the County wrongfully

terminated him from his position as a correctional officer at the Baltimore County Detention

Center ("Detention Center").  He also claims the County subjected him to medical examinations

and inquiries prohibited by the ADA.  Presently pending is a motion for summary judgment filed

by Baltimore County.  For the reasons stated below, the motion will be granted as to Allen's

illegal medical examination/inquiry claim but denied as to his illegal discharge/demotion claim.

## **BACKGROUND**

     In 2000, Allen was diagnosed with sarcoidosis, an inflammatory disease that causes the

growth of lesions anywhere in the body, including the eyes, sinuses, ears, brain, lungs, heart,

kidneys, joints, muscles, and skin.  (Def.'s App., George Dep. 4, App. 185; Def.'s App., New

Patient History and Physical, App. 208.)[1]  Because Allen's sarcoidosis affected practically all of

these body parts, Allen's was considered a "severe" case.  (Pl.'s App., George Dep. 15.)  But Dr.

Stephen W. George, his treating rheumatologist, told Allen that, "with medication . . . [he]

would be okay."  (Def.'s App., Allen Dep. 16, App. 266.)

---

[1] Both parties have filed appendices accompanying their memoranda that are not available on ECF.  The court will begin citations to the exhibits with the source, followed by a description of the cited document and, if appropriate, a page reference.  Because the County did not number its exhibits, citations to the exhibits in the County's appendix will include the continuous page number provided by the County.  Allen did not number his depositions.

In 2001, Allen began working as a correctional officer at the Detention Center.  (*Id.* at 5, App. 264.)  He remained in that position until early 2011, when the demotion at the center of this litigation occurred.  During his ten-year tenure as a correctional officer, Allen generally performed his duties satisfactorily and without any disciplinary incidents.  (*See, e.g.*, Pl.'s App. Ex. 4, Employee Performance Evaluation Form, Nov. 2010 (rating Allen "Successful" in all six correctional officer "Core Competencies").)  In the eyes of Deborah Richardson—the Detention Center's then-Deputy Director and present Director—Allen was a "man of integrity" and a "good correctional officer."  (Pl.'s App., Richardson Dep. 13, 93.)

But Allen's job performance suffered due to his sarcoidosis.  On two occasions, Allen's sarcoidosis flared up so badly that he needed to take leave from his job.  (Allen Aff. ¶¶ 2, 4.)[2] The first flare-up occurred in 2006.  In January of that year, Allen experienced "severe back and lower extremity pain" as well as an "inability to walk."  (Def.'s App., George Letter to Wicks, Feb. 1, 2006, App. 211.)  Allen was admitted to the intensive care unit and was later discharged with antibiotics, and apparently in a wheelchair.  (*See id.*; Def.'s App., George Dep. 117, App 205a.)  Soon thereafter, Dr. George examined Allen and observed that the "serious illness" he had experienced was "due to neurosarcoidosis" and that the disease's effect on his "brain, mid-brain, and spinal cord . . . most likely account[ed] for his rapid functional impairment . . . ." (Def.'s App., George Letter to Wicks, Feb. 1, 2006, App. 212.)  To remedy these symptoms, Dr. George prescribed Decadron to Allen.  (*Id.*)  Based on his exchanges with Dr. George, Dr. Kanthi Wickramaratne,[3] Allen's long-time primary care doctor, certified Allen for leave under the Family and Medical Leave Act ("FMLA"), which the County granted effective January 5,

---

[2] The County opposes Allen's submission of a "self-serving[,]" "sham affidavit[.]"  (Def.'s Reply 3 n.1, ECF No. 80.)  The court will rely on this affidavit to a limited extent; it will be disregarded when it conflicts with Allen's prior deposition testimony.  *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975-976 (4th Cir. 1990).
[3] Because both parties refer to Dr. Wickramaratne as "Dr. Wicks," the court will also do so.

2006.  (Def.'s App., Allen Dep. 57, App. 271; Def.'s App., County Timeline of Events, App. 62.)  Allen does not dispute that he could not perform his correctional officer job when he was "sick" at this time.  (Def.'s App., Allen Dep. 19, App. 267.)

The Decadron therapy proved effective.  Two weeks after he began that treatment, Allen "showed marked improvement": he had "rapid increase in strength, coordination, [and] motor skills; there was a "decrease in ocular and head pain'; and he "no longer need[ed] [a] wheelchair or cane . . . ."  (Def.'s App., George Letter to Wicks, Feb. 15, 2006, App. 213.)  During a second follow-up examination two weeks later, Dr. George noted Allen had "shown excellent response to Decadron therapy and has improved strength and coordination. . . .  He is remarkably improved."  (Def.'s App., George Letter to Wicks, Mar. 1, 2006, App. 214.)  By March 28, 2006, Allen had returned to work.  (County Timeline of Events.)  With the help of his doctors, Allen continued to monitor his sarcoidosis by making regular preventive care visits.  (*See, e.g.*, Def.'s App., Wicks Office Visit, Aug. 21, 2007, App. 140; Def.'s App., Wicks Office Visit, May 14, 2009, App. 144.)

The second flare-up occurred in 2010—and it was this flare-up that initiated the sequence of events that led to this lawsuit.  At some point in May of that year, Allen began experiencing "problems with his gait," a feeling of being "off balance[,]" and weak legs.  (Def.'s App., George Letter to Wicks, June 3, 2010, App. 216.)  Dr. Wicks again certified Allen for leave under the FMLA, stating that Allen was "unable to perform any work" because of "leg edema, knee pain and unsteady gait" linked to his "chronic medical problems with sarcoidosis."  (Def.'s App., FMLA Certification 2, App. 71.)  The County granted this request effective May 5, 2010.  (County Timeline of Events.)  Dr. Wicks continued to evaluate Allen's condition about every

four weeks, and recommended that Allen be "off work" at least through July.[4] (Def.'s App.,

Medical Status, June 29, 2010, App. 135.)  At the end of that month, however, Dr. Wicks

approved Allen to return to work on light duty, effective August 1.  (Def.'s App., Medical Status,

July 26, 2010, App. 136.)

On August 1, 2010, Allen returned to the Detention Center, this time on light duty.  Allen

was assigned to a housing unit pod as a "pod control officer."  (Def.'s App., Allen Dep. 72, App.

275.)  This meant he was in "a bubble" where "[his] duties  were to observe [inmates] and watch

and document activities."  (*Id.*)  At all relevant times, the County had no policy limiting the

duration of a light duty assignment.  (Pl.'s App., Gay Dep. 111.)

Throughout most of this new assignment, Allen performed satisfactorily and without any

issues.  (*See* Pl.'s App., O'Neill Dep. 108-09; Allen Aff. ¶ 6.)  That apparently changed in early

December of 2010, when then-Director James P. O'Neill allegedly observed Allen taking

"approximately 10 minutes" to "walk approximately sixty (60) feet" inside the Detention

Center's administrative offices.  (Def.'s App, O'Neill Decl. ¶ 3, App. 78.)  Based on this

observation—and in light of his experience in corrections—O'Neill "became concerned for

[Allen's] safety as a Correctional Officer"; O'Neill "did not feel that [Allen] would be able to

defend himself if he were attacked by an inmate."  (*Id.*)  As a result, O'Neill instructed a

management analyst to email Lee Anne Bronson in the County's human resources department

with a request that Allen be directed to undergo a fitness-for-duty examination.  (*Id.* ¶ 4, App.

78; Def.'s App., Bruno Email to Bronson, Dec. 17, 2010, App. 81.)  Soon thereafter, Allen

received a letter dated December 20, 2010, instructing him to report to the office of Dr. Peter

Oroszlan, the County's occupational medical advisor, on January 11, 2011, for a fitness-for-duty

---

[4] Allen concedes he was unable to perform the essential functions of his job as of May 5, 2010.  (Def.'s App., Allen Dep. 69-70, App. 274-75.)

examination.  The letter stated that such an examination was necessary because "[he] h[ad] exhausted [his] FMLA benefits" and "[t]o determine if [he] c[ould] safely and reliably perform [his] job duties."  (Pl.'s App. Ex. 5, Fitness For Duty Order.)

Shortly thereafter, on December 22, 2010, Allen returned to see Dr. George.  (Pl.'s App. Ex. 11, George Letter to Wicks, Dec. 22, 2010.)  Dr. George began by noting that he "ha[d] not seen Mr. Allen for 6 months."  Dr. George concluded that the "progressive weakness in both legs" that Allen had been experiencing was connected to his sarcoidosis.  (*Id.*)  He thus started Allen on Decadron therapy, as he had done in 2006.  (*Id.*)  Although he "anticipate[d] improvement in [Allen's] symptoms[,]" Dr. George believed Allen "ha[d] had significant atrophy as a result of his delay in reporting [his] worsening symptoms."  (*Id.*)  Nothing in the record suggests Allen told Dr. George about the fitness-for-duty examination at this time.

Meanwhile, on or around December 29, 2010, Major Bruce Flanigan ordered Allen to resume full duty, (*see* Pl.'s App., Flanigan Dep. 44-45; Pl.'s App., Howdyshell Dep. 29), even though there is no evidence that either Dr. Wicks or Dr. George had approved that change.  Allen complied with the order by "continu[ing] the same pod assignment and simply resum[ing] . . . the additional full-duty functions" of a correctional officer.  (Allen Aff. ¶ 13.)

On January 11, 2011, Allen went to Dr. Oroszlan, who conducted the fitness-for-duty examination.  In his independent medical evaluation ("IME"), Dr. Oroszlan noted he had "only 10 pages of medical records available for review," and those pages showed Allen's history only since February 18, 2010.  (Def.'s App., Oroszlan IME 1, App. 86.)  Dr. Oroszlan's "Summary Assessment" section included two relevant conclusions.  First, in light of "the class specification for Correctional Officer[,]" Allen was "unable to perform all the job-related functions of a Correctional Officer safely, consistently, and reliably and without undue harm to himself and

others." (*Id.* at 5, App. 90.)  Second, "it [wa]s unlikely that [Allen's] overall condition and effort

tolerance will significant [sic] improve in the near foreseeable future." (*Id.*)  Dr. Oroszlan

forwarded this IME to the County's human resources department.  (*See* Def.'s App., Bronson

Email to Bruno, Jan. 21, 2011, App. 92.)[5]

After receiving Dr. Oroszlan's IME, the County decided to initiate the process of

demoting Allen.  On around February 16, 2011, Allen received what the parties have referred to

as an "options letter," which stated the following:

> [I]t has been determined that you are not capable of performing the essential
> functions of your position as a Correctional Officer.  To that end, you must take
> one of the following actions:
>     1) Apply for *and* be granted a transfer to a position for which qualified,
> and able to perform; *or*
>     2) Resign.
> If you do not exercise any of the above options by March 7, 2011, we shall take
> appropriate action to terminate your employment.

(Pl.'s App. Ex. 13, Options Letter (emphases in original).)[6]  On the day he received the letter,

Allen called Richardson in protest, asking why he could not keep his position.  (Pl.'s App.,

Richardson Dep. 29-31.)  Allen was so distressed that he also had his wife speak to Richardson.

(*Id.* at 31.)  Those pleas failed.  Richardson instead told Allen about a vacant correctional

commitment specialist position that he could have "if he wanted it." (*Id.* at 30-31.)  Allen said

"he would think about it and get back to [her]." (*Id.* at 31.)

Meanwhile, on March 3, 2011, Allen returned to Dr. George and explained he had had

"an employment physical during his exacerbation [that] rated him unqualified to do his job."

---

[5] Allen's January 25, 2011, follow-up with Dr. George saw a different prognosis.  Dr. George reported that Allen
was "showing marked improvement" from his Decadron regimen—Allen had "improved alertness, mental capacity,
[and] lower extremity strength."  (Def.'s App., George Letter to Wicks, Jan. 25, 2011, App. 219.)  It is unclear
whether either Dr. George or Dr. Wicks provided this information to the County at that time.
[6] Notably, the record reflects that the first draft of this options letter included two additional options: (1) "Apply for
*and* be granted retirement" and (2) "Apply for *and* have request for a general leave of absence be approved . . . ."
(Pl.'s App. Ex. 16, Emails re: Draft Options Letter, at County.0000226.)  An email from a County employee
indicates she "removed the LOA [i.e., leave of absence] option" in a subsequent draft.  (*Id.* at County.0000223.)
Later, the County also removed the option to retire.

(Def.'s App., George Letter to Wicks, Mar. 3, 2011, App. 220.)  Dr. George also noted that Allen

was "upset since his symptoms ha[d] resolved with treatment of the exacerbation."  (*Id.*)

Because he saw that Allen's sarcoidosis was "much improved following Decadron treatment[,]"

Dr. George stated he would "gladly produce a letter for [Allen's] employer to document his

improvement and the expected ability to perform his usual job responsibilities."  (*Id.*)

On March 7, 2011, Allen accepted Richardson's offer and started working in the new

position because of his "need to support [his] family and protect health benefits for [his] family

and [him]self . . . ."  (Allen Aff. ¶ 18.)  The next day, the County asked him to sign a "Request

for Voluntary Demotion" that stated, in relevant part: "I am voluntarily demoting from

Correctional Officer . . . to Corr[ectional] Commitment Specialist . . . ."  (Pl.'s App. Ex. 19,

Request for Voluntary Demotion.)  "[B]elieving it was a routine administrative form[,]" Allen

"signed it without reading it . . . ."  (Allen Aff. ¶ 21.)  That voluntary demotion became effective

as of March 19, 2011.  As a result of this demotion, Allen's salary fell by 16.4%,[7] (Def.'s App.,

Personnel Transaction Form, Mar. 19, 2011, App. 98), his pension eligibility changed, (*see*

Def.'s App., Dorsey Dep. 10-12), and he was forced to "work a different shift that interfered

with [his] family responsibilities[,]" (Allen Aff. ¶ 18.)

On April 4, 2011, Dr. George faxed a letter regarding Allen's condition to the County's

human resources department.  (Pl.'s App. Ex. 18, George Letter to County, Apr. 2, 2011.)  Dr.

George noted Allen's history of "intermittent exacerbations" of sarcoidosis, but also stated that

Allen had "responded well to [their] management . . . with full recovery of functional capacities

after each exacerbation."  (*Id.*)  Although he agreed with Dr. Oroszlan's assessment that, as of

---

[7] The salary range for correctional officers in the County is $39,667 to $49,828.  (Def.'s App., Correctional Officer Class Specification, App. 99.)  The salary range for correctional commitment specialists is $32,812 to $41,647. (Correctional Commitment Specialist Class Specification, App. 102.)  The record reflects that Allen's salary was at the upper limit of the spectrum.

January 11, 2011, Allen had "functional limitations[,]" Dr. George described as "incorrect" Dr. Oroszlan's conclusion that the limitations "were chronic and that the condition would not likely improve in the foreseeable future." (*Id.*) He specifically noted that the Decadron prescribed three weeks earlier had "resulted in a gradual and progressive resolution of all disease features." (*Id.*) Because he had "[o]ver the past ten years . . . documented repeatedly" the way Allen's exacerbations would "resolve completely with adjustment in his . . . medication[,]" Dr. George requested that Allen undergo a "follow-up IME, as soon as possible," so that Allen "c[ould] be reinstated . . . as a Correctional Officer." (*Id.*)

Upon receiving Dr. George's letter, George Edward Gay—the County's human resources director—"did nothing." (Pl.'s App., Gay Dep. 79.) In Gay's view, because Allen "had already accepted a voluntary demotion[,]" there could be "no reinstatement back up to a correctional officer" position. (*Id.*) Gay did not respond to Allen in any way at this time. (*See Id.* at 81.) Allen continued as a correctional commitment specialist.

On November 17, 2011, Allen filed a charge of discrimination with the EEOC. (Pl.'s App. Ex. 22, EEOC Charge of Discrimination.) Before the County had filed its position statement in response to that charge, Allen received a letter dated February 3, 2012, from O'Neill stating that he "ha[d] been scheduled . . . for a fitness for duty examination." (Pl.'s App. Ex. 23, Fitness for Duty Order & Response, at County.000025.) O'Neill's letter stated no basis or reason for the examination. (*See id.*) On February 8, 2012, Allen responded, noting that, because he "ha[d] not missed a day of work over the past year and [his] performance ha[d] been favorably reviewed[,]" there was "no legal basis for requiring [him] . . . to be examined by the County's doctor." (*Id.* at County.000028.) Allen thus asked O'Neill to "rescind th[at] letter." (*Id.*) Two days later, O'Neill replied, stating he "c[ould] grant [Allen's] request." (*Id.* at

County.000026.)  O'Neill clarified that the appointment scheduled with the County's rheumatologist "was for the purpose of determining if [Allen] could perform the duties and responsibilities of a correctional officer."  (*Id.*)  In his next email, Allen said he was "quite surpris[ed]" by O'Neill's response because the original letter "made no mention at all of [Allen's] right to [his] correctional officer position."  (*Id.* at County.000029.)  He continued: "If you are offering to return me to my position, please contact the EEOC or . . . my lawyer . . . ."  (*Id.*)  On February 21, 2012, O'Neill confirmed to Allen that the examination had been cancelled, without acknowledging Allen's prior response.  (*Id.* at County.000030.)

Nearly a year and a half later, on September 3, 2013, Allen received a right-to-sue letter from the EEOC.  (Def.'s App., Notice of Right to Sue, App. 113.)  He filed this lawsuit on October 15, 2013.  As part of this litigation, on February 18, 2014, the County examined Allen pursuant to Federal Rule of Civil Procedure 35.  (Pl.'s App. Ex. 25, Morris Rule 35 Examination Report, at 2.)  The County's rheumatologist, Dr. Edward J. Morris, concluded that Allen "ha[d] well-controlled sarcoidosis" and "no limitations at this time that would prevent him from informing the essential functions of a Corrections Officer."  (*Id.*)[8]   On June 18, 2014, Richardson "suddenly summonsed" Allen into her office and informed him that he would be reinstated as a correctional officer, (Allen Aff. ¶ 23), apparently because it had recently "dawned on [Richardson] that [reinstating Allen] [wa]s something that [she] c[ould] do[,]" especially given the number of vacant correctional officer positions in the County, (Pl.'s App., Richardson Dep. 17-19).[9]  Because Allen's correctional officer certification had lapsed, Richardson sought and received a waiver of the County's requirement that new correctional officers go through the

---

[8] Dr. Morris was also asked to assess whether Allen could have performed his essential job functions as of January 11, 2011, but stated he "certainly cannot make an assessment about Mr. Allen's ability to work 3 years ago."  (*Id.*)
[9] The record reflects that, at all relevant times, a significant number of such vacancies existed that the County was constantly seeking to fill.  (*See* Pl.'s App., Richardson Dep. 78 (noting existence of twenty-seven vacancies as of April, 2014); Pl.'s App., Bruno Dep. 35-36 (noting County had recently had thirty-one such vacancies)).

training academy.  (Def.'s App., Richardson Email to Liebno, June 18, 2014, App. 308.)

Effective June 23, 2014, Allen was once again a correctional officer in the County, (Pl.'s App.

Ex. 26, Flanigan Email, June 20, 2014), with "the full pay and benefits of that position[,]" (Pl.'s

App. Ex. 27, County Letter to Cahill, June 18, 2014).  On October 9, 2014, the County moved

for summary judgment.

## ANALYSIS

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is

genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party*

*of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir.) (quoting *Dulaney v. Packaging Corp. of Am.*, 673

F.3d 323, 330 (4th Cir. 2012)), *cert. denied*, 134 S. Ct. 681 (2013).  "A fact is material if it

'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48.  The court must view the

evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861,

1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v.*

*Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of*

*the Courts*, --- F.3d ---, No. 13-2212, 2015 WL 1062673, at *4 (4th Cir. Mar. 12, 2015).  At the

same time, the court must "prevent factually unsupported claims and defenses from proceeding

to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting

*Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 2003)).

Allen makes two claims: the County illegally discharged him from his correctional

officer position because of his disability,[10] and the County conducted medical examinations and

inquiries that violated the ADA.  The court considers each claim in turn.

## I.  ADA Illegal Discharge/Demotion Claim

Allen argues the County violated the ADA by "discharging [him] from his correctional

officer position because of his disability" even though he was a qualified individual who was

fully able to perform his essential job functions.  (Compl. ¶ 32.)  The ADA makes it illegal for an

employer to "discriminate against a qualified individual on the basis of disability . . . ."  42

U.S.C. § 12112(a).  To prove disability discrimination, Allen must show: (1) he had a disability;

(2) he was a "qualified individual" who was able to perform the essential functions of his job;

and (3) the County took an adverse action against him because of his disability.  *Jacobs*, 2015

WL 1062673, at *7; *see also Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 443 (4th Cir.

2013), *cert. granted*, 134 S. Ct. 2898 (2014); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686

(4th Cir. 1997).  The County does not concede any of these elements.  Because, however, the

undisputed record reflects that Allen had a disability and genuine disputes exist as to the two

remaining elements, the court will deny summary judgment on this claim.

### A.  Disability

The record reflects that, at all relevant times, Allen had a disability that placed him within

the ADA's protected class.  To receive the ADA's protections, a plaintiff must prove that he has

a "disability"—i.e., that he has, had, or is regarded as having "a physical or mental impairment

that substantially limits one or more major life activities . . . ."  42 U.S.C. § 12102(1); *see also* 29

C.F.R. § 1630.2(g).  Importantly, because the allegedly unlawful acts at issue here occurred after

---

[10] Although Allen has been reinstated as a correctional officer, he seeks to be "reimbursed for the period of diminished earnings while he was removed from [that] position."  (Pl.'s Opp'n 21.)

January 1, 2009, the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA")

applies.[11]  Under the ADAAA, "[t]he definition of disability . . . shall be construed in favor of

broad coverage . . . to the maximum extent permitted by the terms of [the ADA]."  42 U.S.C. §

12102(4)(A); *see also Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014)

(describing Congressional intent behind and impact of ADAAA); *Johnson v. Balt. City Police

Dep't*, Civ. No. ELH-12-2519, 2014 WL 1281602, at *14-15 (D. Md. Mar. 27, 2014) (same).[12]

In light of these changes, Allen plainly had a disability within the ADA's meaning.  Since

at least 2000, Allen has had a serious medical condition—sarcoidosis—that has affected his

immune system.  When the symptoms caused by his condition flared up, he experienced serious

physical impairment to a variety of his bodily functions and organs, including his legs, back,

neck, and sinuses.  (*See, e.g.*, Def.'s App., George Letter to Wicks, Feb. 1, 2006, App. 211.)

And the record reflects that such impairment imposed on Allen substantial limitations on major

life activities such as walking, standing, and working.  Allen's impairment was "sufficiently

severe[.]"  *Summers*, 740 F.3d at 330; *see also id.* (stating that "[t]he text and purpose of the

ADAAA and its implementing regulations make clear" that an impairment that leaves one

"unable to walk . . . can constitute a disability").

The County responds that Allen's sarcoidosis-related symptoms do not constitute a

disability because they appeared only as occasional flare-ups.  In the County's view, such

episodic impairments do not suffice.  This argument fails for two reasons.  First, it ignores the

ADAAA's explicit statement that "an impairment that is episodic or in remission is a disability if

---

[11] The County relies on pre-ADAAA cases that apply now-obsolete disability analysis.  As just one example, the County extensively relies on *Rose v. Home Depot U.S.A., Inc.*, 186 F. Supp. 2d 595 (D. Md. 2002), to support the proposition that "the term 'disability' does not include *temporary* medical conditions . . . , even if those conditions require *extended leaves of absence* from work."  (Def.'s Mot. Summ. J. 32 (emphasis in original) (quoting *Rose*, 186 F. Supp. at 611-12).)  As will be explained below, this proposition is no longer valid.

[12] Unpublished cases are cited for the soundness of their reasoning, not for any precedential value.

it would substantially limit a major life activity when active."  42 U.S.C. § 12102(4)(D); *see also*

*Summers*, 740 F.3d at 333 ("Under the ADAAA and its implementing regulations, an impairment

is not categorically excluded from being a disability simply because it is temporary.").  That is

precisely the case here; when active, Allen's sarcoidosis unmistakably constituted a disability.

*See Summers*, 740 F.3d at 330 (reversing district court's holding that plaintiff's "temporary

injury could not constitute a disability"); *Hodges v. District of Columbia*, 959 F. Supp. 2d 148,

154 (D.D.C. 2013) (holding that post-ADAAA plaintiff's ADA claim—which alleged that a

herniated disc and lumbar disc bulge substantially limited his ability to sit, work, and engage in

other major life activities—was not barred by "the fact that [his] impairment was expected to be

temporary . . . .")).  Second, even had the ADAAA not applied here, the impairment would still

suffice.  As pre-ADAAA case law shows, the episodic impairments Congress intended to fall

beyond the ADA's scope involved truly transitory impairments such as those resulting from

surgery or a temporary back injury, *see Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 468-

69 (4th Cir. 2002) (collecting cases showing "temporary impairments"), and not a chronic

condition like Allen's.  As Dr. George noted, "[w]e're talking about two different things

[]here"—Allen's *condition* is "chronic[,]" even if the *impairment* caused by it is not.  (Pl.'s App.,

George Dep. 30.)  Allen's exacerbated sarcoidosis is a disability within the ADA's meaning.

### B.  Qualified Individual

Whether Allen is a qualified individual is a closer question, but Allen has raised a

genuine dispute on this issue.  To be a qualified individual, a plaintiff must prove that he "can

perform the essential functions of the employment position that such individual holds or

desires[,]" and that he can do so "with or without reasonable accommodation[.]"  42 U.S.C.

12111(8); *see also U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002).  The County argues

Allen could not perform the essential job functions of a correctional officer.  Further, the County asserts the defense that Allen "pose[s] a direct threat to the health or safety of other individuals" at the Detention Center.  42 U.S.C. § 12113(b).  Neither argument succeeds.

### 1. Essential Job Functions

A genuine dispute exists as to whether Allen could perform his essential job functions— "i.e., functions that bear more than a marginal relationship to the job at issue."  *Tyndall v. Nat'l Educ. Ctrs. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994).  "In determining which job functions are essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description . . . for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).[13]  According to the County's class specification, a correctional officer's responsibility is to "maintain[] care and custody of inmates, security, and order on and off the property of the Baltimore County Department of Corrections."  (Def.'s App., Correctional Officer Class Specification, App. 99.)  Examples of "essential duties" include "[a]ssist[ing] in the receiving or discharging of inmates[,]" "[p]atrol[ling], on foot, the internal and external perimeters of the Institution," "[m]aintain[ing] discipline and orderly conduct[,]" "[b]reak[ing] up fights among inmates[,]" and "[u]s[ing] appropriate self-defense tactics to deflect assault by inmates."[14]  (*Id.*)

It is true that, *without* reasonable accommodation, Allen was not a qualified individual during the relevant time period.  Allen himself concedes he was "[u]nable" to perform the essential job functions of his position for a period of time beginning on May 5, 2010, the day his

---

[13] Although an employer's written description is not the only relevant evidence of a job's essential functions, *see* 29 C.F.R. § 1630.2(n)(3), the court need not consider other evidence because Allen does not dispute that the County's class specification accurately states the essential job functions of a correctional officer.

[14] The specification also notes that these duties "are for the purpose of determining a common set of minimum qualifications for all positions in this class."  (*Id.*)  The "Physical Requirements" section states that "Applicants must be able to safely perform the duties of the position without posing a threat to the health or safety of themselves or others, as determined by a test of physical ability."  (*Id.*)  Finally, the specification notes that "[t]he work of this classification entails frequent walking, standing, and . . . interaction with an inmate population . . . ."  (*Id.*)

FMLA leave began.  (Def.'s App., Allen Dep. 69-70.)  And the record reflects that he was unable to walk or even stand while his exacerbated symptoms existed, (*see, e.g.*, Wicks Office Visit Report, July 26, 2010, App. 169 ("Still can't stand for too long.")), which would render him unable to fulfill the essential functions of a correctional officer.

But a genuine dispute exists as to whether Allen was qualified *with* reasonable accommodations.  Allen has presented evidence showing he responded positively to Decadron.[15] In fact, as a result of that regimen, essentially all of the sarcoidosis symptoms that had prevented Allen from performing the essential job functions of a correctional officer dissipated—and rapidly.  Had he been given the opportunity to take such medication—along with time for that medication to take effect—Allen very well may have been a qualified individual.  *See Jacobs*, 2015 WL 1062673, at *17 (concluding that plaintiff had established genuine dispute as to whether she was qualified when "a reasonable jury could conclude that [plaintiff's negative] behaviors were manifestations of [her] performance anxiety and were unlikely to reemerge had the accommodation [at issue] been granted.").  The County could have provided Allen that opportunity by letting him remain on light duty, use accrued leave, or apply for discretionary leave.  And any of these accommodations would have been reasonable because, "[f]or purposes of the ADA, 'reasonable accommodations' may comprise 'job restructuring, part-time or modified work schedules,' and 'permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment . . . .'"  *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344-45 (4th Cir. 2013) (quoting 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630, App. § 1630.2(o)); *see also*

---

[15] Dr. George's deposition testimony reveals just how positive was Allen's response to Decadron.  Dr. George prescribed Decadron on December 22, 2010.  (Pl.'s App., George Dep. 33.)  By January 6, 2011, Allen reported he was feeling much better and had noticed a significant improvement in his condition.  (*Id.* at 33-34.)  Just a few weeks later, Allen "already had a significant improvement in all of his symptoms."  (*Id.* at 34.)  Although he still had "some measureable weakness" in one leg, "he was back to walking normally."  (*Id.*)  By March 3, 2011, "he had fully recovered . . . ."  (*Id.* at 35.)

*Jacobs*, 2015 WL 1062673, at \*16 (noting as reasonable deputy clerk's proposed accommodation "to work fewer days at the counter and more days microfilming or performing other deputy clerk tasks").[16]

Yet the County failed to consider—let alone offer—any of these accommodations, and instead opted for what it termed "voluntary demotion."  In doing so, the County erred in two main ways.

First, the County did not even engage in an interactive process with Allen regarding the possibility of accommodations.  (*See, e.g.*, Pl.'s App., Gay Dep. 107-08 ("There was no interactive process.").)  The County apparently believes it had no obligation to engage in the interactive process because Allen never formally requested an accommodation.  (See Def.'s Mot. Summ. J. 42-43; *see also* Pl.'s App., Gay Dep. 119 (agreeing that it was County "policy and practice that unless Mr. Allen filled out a form and sent it to [the County] requesting reasonable accommodations, . . . [the County] had no duty to consider reasonable accommodations or offer the interactive process").)  But Allen was not required to make a formal request to trigger that process.  *See Wilson*, 717 F.3d at 346-47 ("What matters under the ADA [is] . . . whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999))); *see also Feldman v. Law Enforcement Assocs. Corp.*, 779 F. Supp. 2d 472, 489 (E.D.N.C. 2011) ("a request for accommodation need not, in all cases, be in writing, be made by the employee, or formally invoke the magic words reasonable accommodation.") (quoting *Parkinson v. Anne Arundel Med. Ctr.*, 79 F. App'x 602, 604-05 (4th Cir. 2003) (unpublished) (internal quotation marks omitted))).

---

[16] The County does not argue that any of these accommodations "would impose an undue hardship" on its operations.  42 U.S.C. § 12112(b)(5)(A).

Even assuming he had been required to make such a formal request, the record reflects he did so by seeking medical leave in May of 2010 for his "chronic medical problems with sarcoidosis." (Def.'s App., FMLA Certification 2, App. 71.)  From that point forward, the County had adequate notice of Allen's disability and had a duty to engage in the interactive process.  *See Summers*, 740 F.3d at 331 n.4 ("[A]n employee's accommodation request, even an unreasonable one, typically triggers an employer's duty to engage in an 'interactive process' to arrive at a suitable accommodation collaboratively with the employee."); *Wilson*, 717 F.3d at 346-47.[17]  The record shows the County failed to do this.  For instance, after observing Allen having difficulty walking, O'Neill did not ask Allen or anybody else about his condition, apparently because O'Neill was "in the middle of several other things."  (Pl.'s App., O'Neill Dep. 43-44.)  O'Neill further concedes he failed to look at Allen's personnel file, medical file, leave status, or performance reviews before requesting a fitness-for-duty examination.  (Pl.'s App., O'Neill Dep. 45-46.)  In fact, O'Neill admits he observed Allen engaging in his job only once.[18]  (*Id.* at 47.)  And O'Neill's response was not unique; Flanigan likewise did nothing to explore the history or nature of Allen's condition.  (*See* Pl.'s App., Flanigan Dep. 33-35 (admitting failure to look into leave status, medical notes, supervisor's evaluations, and performance appraisals).)

The County responds that Allen's "own failure to engage in the 'interactive process' caused the process to break down[.]"  (Def.'s Reply 24.)  It is true that Allen perhaps not always provided timely and consistent updates on his worsening condition either to his own specialist or to anyone with the County.  This lack of communication may have contributed to his

---

[17] Allen, of course, had a reciprocal obligation to communicate with the County.  *See, e.g.*, *Fleetwood v. Harford Sys. Inc.*, 380 F. Supp. 2d 688, 701 (D. Md. 2005) (Blake, J.) ("[T]he ADA requires that the employer *and employee* engage in an interactive process to identify a reasonable accommodation." (emphasis added)).
[18] O'Neill also concedes he "didn't read Dr. Oroszlan's report" before issuing the options letter.  (*Id.* at 99.)

deteriorating condition.  At the same time, Allen is not a doctor, nor is there any evidence that he withheld information intentionally.  Instead, the record reflects that Allen was "unaware that his disease was flaring."  (Pl.'s App., George Dep. 16.)  Moreover, Allen trusted in Dr. Wicks' expertise and even this doctor failed "to recognize [Allen's] acute sarcoid flare-up . . . ."  (*Id.* at 121.)  Finally, to the extent the County argues it "did not have the full medical picture . . . because [Allen] himself had failed to provide it to the County[,]" (Def.'s Reply 24), such failure did not cause the breakdown because the record shows the County failed even to check Allen's medical file before starting the demotion process.

Second, the County failed to consider less drastic—yet still reasonable—accommodations than "voluntary demotion."  The County argues it provided a reasonable accommodation by reassigning Allen to the vacant correctional commitment specialist position.  (Def.'s Mot. Summ. J. 42-43.)  Although the ADA vests the employer with ultimate discretion over which effective accommodation to provide, reassignment is a "last resort."  *See Reyazuddin v. Montgomery Cnty., Md.*, 7 F. Supp. 3d 526, 550 (D. Md. 2014) ("Reassignment . . . has traditionally been seen as an 'accommodation of last resort[.]'"); *see also Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 742 (D. Md. 1996) ("[I]t is clear from the statutes and the regulations that accommodation by transfer is to be considered as a last resort."); *accord Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003) ("[R]eassignment is an option to be considered only after other efforts at accommodation have failed." (internal quotation marks and citations omitted)); *Dilley v. SuperValu, Inc.*, 296 F.3d 958, 964 (10th Cir. 2002) ("In reasonably accommodating an employee under the ADA, '[t]he employer should first consider lateral moves to positions that are regarded as equivalent,' and 'may only consider lesser jobs that constitute a demotion if there are no such equivalent positions available.'" (citation omitted)).  As noted, the

County could have let Allen remain in a light duty position.[19]  The County could have let Allen use his accrued leave.  And the County could have given Allen the option to seek discretionary leave.[20]  Instead, by initiating the "voluntary demotion" process without any substantial inquiry, and without considering other clearly reasonable accommodations, the County failed to honor its obligations to Allen under the ADA.

### 2.  Direct Threat Defense

The County also argues it has carried its burden of showing that Allen constituted a "direct threat" to the health or safety of others at the Detention Center.  For two reasons, the County's argument fails.  As an initial matter, the County misinterprets the ADA's definition of "direct threat."  The ADA defines that term as "a significant risk to the health or safety of others that *cannot be eliminated by reasonable accommodation*."  42 U.S.C. § 12111(3) (emphasis added).  In other words, an "employer must determine whether a reasonable accommodation would either eliminate the risk or reduce it to an acceptable level."  *Champ v. Balt. Cnty.*, 884 F. Supp. 991, 998 (D. Md. 1995) (citing 29 C.F.R. § 1630, App. § 1630.2(r)).  The County ignores the second half of that definition by failing to consider how reasonable accommodations would have affected any risk Allen posed.  And a genuine dispute exists as to whether those risks could have been eliminated by any of the reasonable accommodations noted above.

---

[19] The County appears to believe that this was impossible because the County "d[id]n't have permanent light duty." (Pl.'s App., Gay Dep. 110.)  But nothing in the record shows Allen sought a *permanent* light duty position; he wanted simply to remain in light duty until his symptoms dissipated.

[20] The County argues that granting Allen leave was unreasonable because he had already exhausted his accrued leave.  But the record shows that, at least as of February 14, 2011, Allen's leave balance exceeded sixty-two days. (*See* Pl.'s App., Howdyshell Dep. 25-26 (showing that, as of February 14, 2011, Allen had 120.75 hours of sick leave, 103.75 hours of compensatory leave, 216 hours of vacation, and 48 hours of personal leave).) Even assuming he had exhausted his leave as of December 2010, that would not have affected the County's ability to provide "additional unpaid leave"—something the County originally contemplated offering, but ultimately decided not to offer.  (*Compare* Pl.'s App. Ex. 16, Emails re: Draft Options Letter, at County.0000226 (including option of "request for a general leave of absence"), *with* Pl.'s App. Ex. 13, Options Letter (excluding that option).)

The County's direct threat defense also fails because the record shows that the County failed to base its determination "on an individualized assessment of [Allen]'s present ability to safely perform the essential functions of [his] job." 29 C.F.R. § 1630.2(r); *see also Champ*, 884 F. Supp. at 998 ("The decision that an individual creates a direct threat . . . must depend on an individualized assessment of the safety risks the disabled individual actually poses." (citing *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 (1987))).  Such an assessment must consider factors such as: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." 29 C.F.R. § 1630.2(r).  No such individualized assessment occurred here.  Instead, the County relied on suppositions and generalizations.  The first basis for the County's decision was O'Neill's opinion based on a one-time observation that Allen did not have the ability to perform his job safely.  (O'Neill Decl. ¶ 3, App. 78.)  The second basis was Dr. Oroszlan's IME, which "offer[ed] nothing more than the generalized, conclusory statements" that Allen could not perform his essential job duties, without once considering "whether the safety concerns could be alleviated by reasonable accommodation." *Taylor v. Hampton Roads Reg'l Jail Auth.*, 550 F. Supp. 2d 614, 618-620 (E.D. Va. 2008).  The County has not presented enough undisputed evidence to prove direct threat.

\* \* \*

Because a genuine dispute remains as to whether Allen was a qualified individual had he been given a reasonable accommodation, and because the County has not carried its burden of showing Allen constituted a direct threat, summary judgment will not be granted on this issue.

## C.  Adverse Employment Action

A genuine dispute also remains as to whether the County subjected Allen to an adverse employment action because of his disability by demoting him from correctional officer to correctional commitment specialist.  An adverse employment action is one that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment."  *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (alteration in original) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001)).  The "typical" examples are "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion . . . ."  *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).  A reassignment is also sufficient if the plaintiff can show that the reassignment had "some significant detrimental effect on her."  *Id.* at 256.

The record reflects Allen suffered an adverse employment action here.  That he was demoted is sufficient.  *See, e.g.*, *Boone*, 178 F.3d at 255.  Even construing the action at issue as a reassignment, the record clearly reflects Allen experienced "significant detrimental effect" as a result of it: his compensation and retirement prospects substantially fell, his job title changed, his level of responsibility shrunk, and his opportunity for promotion vanished.  This, too, is enough.

The County's primary argument on this issue is that no adverse employment action took place because Allen "knowingly and voluntarily accepted" his demotion.  But a genuine dispute exists as to whether Allen voluntarily did so.  In assessing voluntariness, the court "look[s] to the circumstances of the [demotion] to determine whether the employee was denied the opportunity to make a free choice."  *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 174 (4th Cir. 1988)[21]; *see also Bauer v. Holder*, 25 F. Supp. 3d 842, 852-54 (E.D. Va. 2014) (applying *Stone* analysis to Title VII claim).  In making that assessment, the court considers whether the

---

[21] Although *Stone* was a section 1983 civil rights action in which plaintiff claimed his termination deprived him of due process, it is appropriate authority here because "the dispositive factual inquiry—whether the apparent '[demotion]' was in fact involuntary—is essentially the same in both situations."  *Id.* at 173.

employee: (1) "was given some alternative to [demotion]"; (2) "understood the nature of the choice he was given"; (3) "was given a reasonable time in which to choose"; and (4) "was permitted to select the effective date of [demotion]." *Id.*

Here, a reasonable factfinder could conclude that the options letter coerced Allen to accept the demotion. The only alternative to demotion that the "options" letter provided was resignation. And failure to "exercise any of the above options"—that is, either demotion or resignation—resulted in "appropriate action to terminate [Allen's] employment." (Pl.'s App. Ex. 13, Options Letter.) Under those circumstances, Allen had "no genuine choice or alternative at all"—"the so-called 'choice' [wa]s wholly illusory . . . ." *Bauer*, 25 F. Supp. 3d at 852-53. Allen clearly understood the import of the "options" available to him; in fact, if anything, that understanding is what led him and his wife to ask Richardson to let him continue as a correctional officer. (Richardson Dep. 30-31.) While Allen had two weeks to make a decision, the record reflects that, unlike in *Stone*, Allen did not and could not "dictate[] the terms of his [demotion] himself[.]" *Stone*, 855 F.2d at 177. Demotion was "clearly non-negotiable[,]" *Bauer*, 25 F. Supp. 3d at 853, and no amount of time would have given him the chance to change that outcome. Allen has raised a genuine dispute as to the voluntariness of his demotion.

The circumstances surrounding Allen's demotion also raise a reasonable inference of unlawful discrimination. Three facts supporting this inference stand out. First, the County had several dozen correctional officer vacancies even as it chose to demote Allen. Second, less than a week before Dr. Oroszlan conducted his IME, Allen had been rated "Successful" on his annual performance evaluation. (Pl.'s App. Ex. 4, Employee Performance Evaluation Form, Nov. 2010.) Third, the initial draft of the options letter included two additional options—retirement and general leave of absence—that were ultimately removed, which, if anything, supports an

inference that the County intended to force Allen out of his correctional officer job.  A reasonable factfinder could thus conclude that Allen suffered an adverse employment action because of his disability.[22]  Accordingly, the court will deny summary judgment on this issue.

## II.  ADA Illegal Medical Examination/Inquiry Claim

Allen also argues the County violated the ADA by "requiring [him] to submit to unnecessary and overbroad medical examinations and disability-related inquiries" that were neither job-related nor consistent with business necessity.  (Compl. ¶ 28, ECF No. 1.)  The ADA prohibits an employer from requiring employees to undergo a medical examination "unless such examination . . . is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  Because the County's IME met this standard, the court will grant summary judgment on this claim.

Although there is "sparse" case law on the point,[23] "other Circuits have clarified what is required for a medical examination to be 'job-related and consistent with business necessity.'" *Blake v. Baltimore Cnty., Md.*, 662 F. Supp. 2d 417, 422 (D. Md. 2009) (citing *Conroy v. N.Y. State Dep't of Corr. Serv.,* 333 F.3d 88 (2d Cir. 2003); *Tice v. Centre Area Transp. Auth.,* 247 F.3d 506 (3d Cir. 2001)), *aff'd*, 439 F. App'x 208 (4th Cir. 2011).  The Second Circuit has held, for example, that an employer must prove: "(i) 'that the asserted "business necessity" is vital to the business,' (ii) 'that the examination . . . genuinely serves the asserted business necessity,' and (iii) 'that the request is no broader or more intrusive than necessary.'"  *Blake*, 662 F. Supp. 2d at 422 (quoting *Conroy*, 333 F.3d at 97-98).  EEOC guidance also addresses this issue, stating that

---

[22] For similar reasons, Allen has offered enough evidence to show that, under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), any legitimate nondiscriminatory reasons the County had to demote him were pretextual.

[23] *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 246 (4th Cir. 1997), appears to be the only Fourth Circuit case to address the ADA's provision on medical examinations and inquiries, but does not provide much guidance here.

any employer-ordered examination must be restricted to discerning whether an employee can perform the essential functions of his or her job. *See, e.g.*, 29 C.F.R. § 1630, App. § 1630.14(c).

Here, the County's order requiring Allen to undergo an IME met that standard. O'Neill's concern about Allen's walking speed clearly related to Allen's job, which required him to, among other things, make foot patrols and maintain order in the Detention Center. The IME order was consistent with business necessity because it was conducted to "ensur[e] that the workplace [wa]s safe and secure . . . ." *Conroy*, 333 F.3d at 97. This is even more true because "[t]he needs of correctional facilities for secure and adequate staffing are particularly strong . . . ." *Id.* at 99.[24]

Instead of presenting evidence suggesting that the IME order was neither job-related nor consistent with business necessity, Allen makes several unsuccessful arguments. First, Allen argues O'Neill's sole observation of Allen's walking problem did not justify the IME because no evidence existed showing Allen's job performance was poor. While it is true that O'Neill's observation, standing alone, might not have been sufficient to justify an IME, the record reflects O'Neill knew that Allen had been on light duty for "six months or so[,]" (Pl.'s App., O'Neill Dep. 42), and therefore had reason to doubt Allen's capacity to perform his duties.[25] Second, Allen argues the IME was overbroad. Yet nothing in the record suggests Dr. Oroszlan went beyond the scope of a necessary evaluation. If anything, given the scant past medical records in his possession, (*see* Def.'s App., Oroszlan IME 1, App. 86), Dr. Oroszlan inquired into only a limited period of Allen's medical background. Finally, Allen objects to Dr. Oroszlan's

---

[24] In his opposition, Allen quotes only half of the basis for the IME, (*see* Pl.'s Opp'n 7-8), and fails to mention that the IME was also scheduled "[t]o determine if [Allen] c[ould] safely and reliably perform [his] job duties[,]" (Pl.'s App. Ex. 5, Fitness For Duty Order).

[25] It may seem inconsistent to conclude the County was justified in requiring Allen to undergo an IME but was not justified in initiating the demotion process when the basis for both conclusions was identical—that is, O'Neill's observation of Allen walking with difficulty in the Detention Center. But the standard for subjecting an employee to an IME is not the same as the standard for assessing whether a discharge or demotion was unlawful.

administration of the IME because he was not a rheumatologist.  But the fact that Dr. Oroszlan

was not a rheumatologist has no bearing on whether he could conduct a general medical

examination to determine whether Allen was fit for duty.  The County did not violate the ADA

by requiring him to undergo an IME.

## CONCLUSION

At a minimum, genuine disputes remain as to Allen's ADA illegal discharge/demotion

claim: Allen has presented sufficient evidence to show he has a disability, that he was otherwise

qualified for the correctional officer position, and that he suffered an adverse employment action

because of his disability.  If anything, viewing the record in the light most favorable to Allen, as

the court must, the County forced Allen to accept demotion—and did so without engaging in the

interactive process, and without considering less harsh reasonable accommodations.  Because

such conduct would violate the ADA, the court will deny summary judgment to the County on

Allen's illegal discharge/demotion claim.  As to Allen's illegal medical examination/inquiry

claim, the undisputed evidence shows the County's decision to require Allen to undergo an IME

was both job-related and consistent with business necessity.  Accordingly, the court will grant

summary judgment to the County on that claim.

A separate Order follows.


March 17, 2015                                        /S/
        Date                                        Catherine C. Blake
                                                    United States District Judge