IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ESTATE OF ALFRED ALLEN, JR.    *

v.                              *      Civil Action No. CCB-13-3075

BALTIMORE COUNTY, MARYLAND      *

                                *
                              ***

## Memorandum

The plaintiff, the Estate of Alfred Allen, Jr.,[1] has sued the defendant, Baltimore County, Maryland, for alleged violations of the Americans with Disabilities Act, and requests damages in the form of back pay. He claims the County forced him to resign from his job despite his ability to perform the essential functions of his position with or without reasonable accommodations. After a trial resulted in a hung jury, the parties now ask the court, pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, to issue findings of fact and conclusions of law. For the reasons stated below, the court finds that the County violated the ADA and Allen is entitled to back pay.

## Background

Allen was hired by the Baltimore County Department of Corrections in 2001, (8/4/15 Trial T. at 191, ECF No. 166), a year after he was diagnosed with sarcoidosis, (*id.* at 193), an inflammatory disease that forms harmful nodules in affected organs if left untreated. (8/5/15

---

[1] Alfred Allen was the plaintiff in the lawsuit until his passing in August 2017.

1

Trial Tr. at 7-8, ECF No. 167). Over the course of nine years with the Department, Allen's sarcoidosis affected his employment only twice. This action arises out of the second incident.[2]

A sarcoidosis flare-up struck Allen in 2010. (8/4/15 Trial T. at 198). To recover, Allen requested leave in May of that year and light duty status when he returned to work in August. (*Id.* at 198-99). Allen served as a light duty officer for seven months; the Department does not have an express policy limiting the time an employee may spend on light duty, (8/3/15 Trial T. at 83, ECF No. 165).[3]

Five months into Allen's light duty service, Department Director James P. O'Neill saw Allen struggling to walk and began a formal inquiry into Allen's fitness for duty. (8/4/15 Trial T. at 13-14). On January 11, 2011, Allen was examined by Dr. Peter Oroszlan, a doctor chosen by the Department, who found Allen "unable to perform the essential duties . . . of a Correctional Officer safely, consistently and reliably . . . . [I]t is unlikely that his overall condition . . . will significant[ly] improve in the near . . . future." (Pl.'s Ex. 25, ECF No. 195). Dr. Oroszlan is not a rheumatologist and had never treated someone with a sarcoidosis case like Allen's, (8/6/15 Trial T. at 54, ECF No. 168). He did not find Allen unable to perform the duties of his light duty position; indeed, Allen performed light duty service without incident until the Department told him he had to leave his position February 2011. (8/4/15 Trial T. at 204, 208).

Upon receiving the results from Allen's medical examination, Department administration decided, without further investigation or collaboration with Allen, to send Allen an "options letter." The letter presented Allen with three options: transfer to a position for which he was

---

[2] Allen suffered a sarcoidosis flare-up in 2006 that required him to take medical leave. (8/4/15 Trial T. at 195-6). Allen made a full recovery and worked, without notable incident, until his flare-up in 2010. (8/5/15 Trial T. at 13-14, 34).
[3] Director O'Neill testified, however, that light duty status was limited despite there being no express policy to that effect. (Def.'s Apx. at 195, 198, ECF No. 195).

qualified, resign, or face termination. (Pl.'s Ex. 26).[4] Notably, an earlier draft of the letter included a fourth option for a general leave of absence. (8/4/15 Trial T. at 154).

Upset by the letter, Allen and his wife called Deputy Director Deborah Richardson to plead for his job back. (8/5/15 Trial T. at 160-61). Richardson told them she could not withdraw the options letter, (*id.*), but Allen could apply for two open civilian positions in the Department, one in security and a higher paying one in records, (*id.* at 147-48). Allen settled on the records clerk position and asked for two weeks to collect himself before starting his new job. (8/4/15 Trial T. at 216-17).

Two weeks later, Allen was asked to, and did, sign a form titled "Request for Voluntary Demotion."(*Id.* at 100-01). Allen testified, however, that he felt he "had no other choice but to sign [the form]." (8/5/15 Trial T. at 100-03). A month later, Allen's personal doctor, Dr. Stephen P. George, a rheumatologist, sent a letter to the Department objecting to Dr. Oroszlan's assessment of Allen's sarcoidosis and insisting, because he responded well to treatment, that Allen should be reinstated to his position. (Pl.'s Ex. 36). The letter came after a March 3, 2011, visit when Dr. George first learned of Allen's employment changes and felt obligated to inform the Department of Allen's "clearly reversible disease." (8/5/15 Trial T. at 20). According to Dr. George, Allen had shown "remarkable improvement" by the end of January 2011 and recovered full function by early March. (*Id.* at 18-19, 71-72). Indeed, Allen won a perfect attendance award the same year he received the options letter. (8/4/15 Trial T. at 11, 193).

A few months later, Allen filed a charge with the EEOC claiming the County violated the Americans with Disabilities Act. (Pl.'s Ex. 67). The Equal Employment Opportunities

---

[4] The County argues that the letter actually provided Allen with six options because Allen could have requested leave under a provision in his union contract and Allen was offered the opportunity to transfer to other positions, each of which the County counts as an additional option. (Def.'s Apx. at 183-87, 432-39). The letter, however, made no mention of the contract provision and already offered Allen the ability to transfer to other positions.

Commission granted Allen the right to sue, and Allen filed his complaint in this court in October 2013. In 2014, while this case was proceeding, the Department reinstated Allen to his correctional officer position. (*Id.* at Ex. 37). After a trial in August 2015 resulted in a hung jury, the plaintiff withdrew his claim for damages other than back pay. The parties agreed to a bench trial on the remaining issues based on the exhibits and testimony the court had already heard, and submitted proposed findings of fact and conclusions of law in 2017. Before the court could reach a decision, however, Allen passed away. Allen's Estate took his place in this lawsuit. (ECF No. 215).

**Analysis**

Allen claims the County violated the ADA by discharging him from his position as a correctional officer because he could perform the essential functions of his job with reasonable accommodations and his reassignment was an involuntary adverse employment action.

I. Unlawful Discharge under the ADA

Under the ADA it is illegal for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The Act requires Allen to prove: (1) he had a disability; (2) he was "qualified" to perform his job; and (3) he suffered an adverse employment action because of his disability.[5] *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015). The County no longer disputes the existence of Allen's disability but does insist Allen was unable to perform his job adequately and that he voluntarily accepted what he now argues was an adverse employment action.

---

[5] The County analyzes Allen's arguments under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework. Allen has never proceeded under that framework, however.

A. Qualified Individual

An employee is a "qualified individual" if he is able to perform the essential functions[6] of his position "with or without reasonable accommodation," 42 U.S.C. § 12111(8), at the time of the alleged adverse employment action. *E.E.O.C. v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377, 379 (4th Cir. 2000). A reasonable accommodation under the Act includes "job restructuring, part-time or modified work schedules," 42 U.S.C. § 12111(9)(B), and "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment," *Wilson v. Dollar General Corp.*, 717 F.3d 337, 344-45 (4th Cir. 2013) (quoting 29 C.F.R. § 1630.2(*o*). If the accommodation includes leave, the employee must show, "at the point at which he would have returned from leave, he could have performed the essential functions of his job." *Id.* at 346. An accommodation is not reasonable if it would present an undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A).

The ADA requires an employer to engage in an "interactive process to arrive at a suitable accommodation collaboratively with the employee," *Summer v. Altarum Institute, Corp.*, 740 F.3d 325, 331 n.4 (4th Cir. 2014), generally after "an employee communicates to his employer his disability and his desire for an accommodation for that disability," *Wilson*, 717 F.3d at 346-47. When an employer is aware of its employee's disability and need for an accommodation, however, "it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 1630.2(*o*)(3). This position respects the ADA's statutory focus on notice. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) ("What matters under the ADA [is] . . . whether the employee or a representative for the employee provides the employer with enough information that, under the

---

[6] A correctional officer's essential duties include receiving and discharging inmates, patrols, maintaining discipline and orderly conduct, and operating communication equipment. (Def.'s Apx. at 78).

circumstances, the employer can be fairly said to know both the disability and desire for an accommodation.").

a. Reasonable Accommodations

The County argues Allen was not qualified for full duty employment when he received the 2011 options letter, with or without reasonable accommodations. Allen's rapid recovery from his sarcoidosis flare-up, however, is not disputed: his symptoms showed "remarkable improvement" by January 25, 2011, and Allen regained full function by March 2011. (8/5/15 Trial T. at 18-19, 71-72). The County also concedes that the Department did not limit the time an employee may spend on light-duty and that Allen had accumulated 55 days of leave by February 16, 2011, options that, if provided to Allen, would have granted him the time he needed to heal before returning to full duty. The County also does not claim that granting Allen any of these accommodations would have created an undue hardship or deny that the ADA contemplates leave as a reasonable accommodation specifically when, as here, the employee shows he can return to full duty by the end of his leave.

In sum, the undisputed record supports these findings: Allen's sarcoidosis symptoms could be and were promptly treated; there were at least three accommodations either of which would have provided Allen the time, from when he received the options letter, he needed to recover; some form of leave or light duty was not an undue hardship; and Allen was given only three options by the County, not one of which was accrued leave, discretionary leave, or additional light duty. Put plainly, Allen was a qualified individual.

The County attempts to overcome the inevitable conclusion of this account by arguing that Allen did not provide medical records indicating his condition could be and was improved. But the law does not impose a duty on Allen, when confronted with an adverse employment

6

action resulting from a disability, unilaterally to develop a plan for the accommodation of his disability. *See Jacobs*, 780 F.3d at 581. Rather, the ADA requires the employer to engage in an interactive process with an employee to develop reasonable accommodations. *Id.* In this case, if the County was unaware that Allen was recovering from his sarcoidosis flare-up, or that reasonable accommodations would have allowed Allen to perform the essential functions of his job, it is because the County failed to engage with Allen in an interactive process.

b. Interactive Process

The County argues that the options letter it sent to Allen was the beginning of its engagement in the interactive process and, because Allen never requested an accommodation after receiving the letter, he failed to participate in good faith in the process. The County misunderstands its obligations under the ADA.

The interactive process is a collaborative exchange between employer and employee to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3). The letter the County sent to Allen is more like the final offer of an adverse contract negotiation than a cooperative exercise searching for reasonable solutions to a disability. Far from an olive branch, it did not ask Allen to participate in meetings, or for additional medical information, or even for alternative accommodations. It offered him only three, seemingly nonnegotiable, options: termination, resignation, or reassignment.

The County finds Allen's failure to submit his optimistic medical records after receiving the options letter baffling.[7] The court, however, finds it evidence that the letter was not an

---

[7] The County also asserts that Allen is unqualified because he failed to seek medical treatment. There is no evidence in the record, however, that Allen failed to follow his doctor's treatment advice. *See Rose v. Home Depot U.S.A., Inc.*, 186 F. Supp. 2d 595, 616-17 (D. Md. 2002). And Allen's primary care physician, referred to by the parties as

7

earnest engagement in the interactive process, but rather a unilateral decision about the future of Allen's employment with the County. This conclusion is further bolstered by Allen treating the letter as a final employment decision and pleading for his job back. (8/4/15 Trial T. at 213).[8]

The County also argues that if Allen had only asked for an accommodation he would have been granted one. Although the interactive process is "generally triggered when an employee communicates to his employer his disability and his desire for an accommodation," *Wilson*, 717 F.3d at 346-47, "it may be necessary for . . . [an employer] to initiate an informal interactive process," 29 C.F.R. § 1630.2(*o*)(3), when the employer is aware of the disability and the need for an accommodation.

There is no doubt the County knew of Allen's illness and his need for accommodations. Allen received the options letter because a medical examination required by the County, after the Director witnessed Allen struggling with his disability, described the severity of Allen's sarcoidosis. And the County had previously given Allen accommodations. The County also was aware that Allen wished to keep his job; Allen pleaded with Deputy Director Richardson to withdraw the options letter. (8/4/15 Trial T. at 213).[9] Nor did the County need Allen's help fashioning appropriate accommodations. The record shows an early draft of the options letter included an option for a general leave of absence. (8/6/15 Trial T. at 154). Under these circumstances, the County was required "to take some initiative." *Taylor*, 184 F.3d at 315.

---

Dr. Kanthi Wicks, whom he saw while suffering from sarcoidosis symptoms in 2010, may not have diagnosed Allen with a sarcoidosis flare-up and, in any case, did not refer Allen to his rheumatologist. (8/5/15 Trial T. at 26-28).

[8] Further, even if the letter were part of the interactive process, reassignment should have been considered the accommodation of last resort. 29 C.F.R. 1630.2(*o*) (appendix) ("In general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship."); *see also Reyazuddin v. Montgomery Cnty., Md.*, 7 F. Supp. 3d 526, 550 (D. Md. 2014), *rev'd on other grounds*, *Reyazuddin v. Montgomery Cnty, Md.*, 789 F.3d 407 (4th Cir. 2015).

[9] Contrary to the County's assertions, therefore, this case is not like *Fleetwood v. Harford Systems Inc.*, 380 F. Supp. 2d 688 (D. Md. 2005), where an employee never informed his employer that he was diagnosed with a disability. *Fleetwood*, 380 F. Supp. 2d at 702. Further, even on those facts the court denied the employer's motion for summary judgment on the employee's related claim. *Id.*

Instead, when confronted by Allen's desire to keep his job, the County gave no hint that it would consider alternatives but resolutely rejected Allen's request for the letter's withdrawal.

Embracing its knowledge of Allen's disability, the County also argues that, because of Dr. Oroszlan's grim prognosis, it thought Allen would never return to full duty.[10] Dr. Oroszlan is not a rheumatologist, however, and never treated a case of sarcoidosis like Allen's. (8/6/15 Trial T. at 54). Indeed, he testified, by practice, he refers patients suffering from sarcoidosis to specialists. (*Id.* at 54-55). In short, the County relied on the opinion of a non-specialist, without asking Allen for input, considering Allen's private medical records, or considering reasonable accommodations; hardly enough to "identify the precise limitations resulting from the disability." 29 C.F.R. § 1630.2(*o*)(3).

On these facts, the County cannot escape liability by claiming Allen should have offered reasonable accommodations, especially after he received an options letter terminating his employment. (8/4/15 Trial T. at 213-14). Accordingly, because Allen could have performed the essential duties of his position with reasonable accommodations and the County did not engage in an interactive process, Allen was a qualified individual under the ADA.[11]

### B. Adverse Employment Action

The ADA requires an employee to suffer an adverse employment action before an employer may be liable. To be "adverse," an employment action must have more than a minor effect on "the terms, conditions, or benefits of the plaintiff's employment," *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2004), rather it must include an effect such as a

---

[10] The County eventually rehired Allen as a correctional officer in 2014.
[11] To the extent the County raises a "direct threat" defense the same reasoning applies. *See* 42 U.S.C. § 12111(3); *see also Champ v. Balt. Cnty.*, 884 F. Supp. 991, 998 (D. Md. 1995) (The "employer must determine whether a reasonable accommodation would either eliminate the risk or reduce it to an acceptable level" and "[t]he decision that an individual creates a direct threat . . . must depend on an individualized assessment of the safety risks the disabled individual actually poses.").

"decrease in compensation, job title, level of responsibility, or opportunity for promotion," *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007).

The County does not dispute that Allen suffered an adverse employment action.[12] Instead, it claims Allen consented to his reassignment by signing a "Request for Voluntary Reassignment" form. In the due process context, courts evaluating the voluntariness of an employment decision may proceed under either a misrepresentation theory or a coercion theory. Applying the misrepresentation theory, the court may find a resignation involuntary if it was "induced by an employee's reasonable reliance upon an employer's misrepresentation . . . concerning [an] alternative to resignation." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 174 (4th Cir. 1988). And if proceeding under the coercion theory, the court should look to the totality of the circumstances, but must at least consider: "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of his resignation." *Id.* An employee is not coerced simply because he must choose between unpleasant alternatives. This is true, "even where the only alternative to resignation is facing possible termination for cause." *Id.*

The County argues that, because he signed a voluntary reassignment letter and failed to suggest alternative accommodations, Allen voluntarily accepted reassignment. It also claims the letter cannot be coercive simply because it offered Allen unpleasant options. These arguments fail under either theory.

The County's exclusion of reasonable alternatives, intentional or not, confounded the nature of Allen's choice. Allen may have had time to decide his course after receiving the letter, the ability to choose the start date for his new position, and been given options other than

---

[12] The record leaves no doubt that Allen suffered an adverse employment action because of his disability.

resignation, but he was not offered a fair representation of the true scope of his options. Thus, the letter is coercive not because it gave Allen only bad options, but rather because it stripped Allen of the options the law required the County to develop through the interactive process.

Put another way, Allen involuntarily accepted a new, less favorable position, because of the County's misrepresentation concerning the alternatives to reassignment and, thus, its failure to satisfy its obligations under the ADA.[13]

To decide Allen's circumstance was voluntary would allow employers to avoid the interactive process altogether by having their employees sign voluntary reassignment forms after sending them unlawfully limited "options letters" like the one sent to Allen. This result would undermine EEOC regulations and the requirements of the ADA.

Considering the totality of the circumstances, by not including the choice of sick leave, discretionary leave, or light duty, the County by means of misrepresentation and/or coercion led Allen to sign a so-called voluntary reassignment form without the benefit of alternate employment accommodations required by law. Accordingly, Allen suffered an adverse employment action for which the County is responsible.

* * *

Because the record shows Allen could have performed the essential duties of his position with reasonable accommodations the County failed to consider or offer to him, and because Allen suffered an adverse employment action as a result of the County's failure to make those reasonable accommodations, the County violated the ADA when it removed Allen from his position as corrections officer. The court will enter judgment in favor of Allen.

---

[13] By contrast, the defendant in *Stone* had cause to terminate the plaintiff and was not required to provide the plaintiff alternatives to the employment options they provided. *Stone*, 855 F.3d at 177-78. As a result, the *Stone* court held that the plaintiff resigned voluntarily.

C. Remedy

Under the ADA, the court may award back pay and pre-judgment interest. *See Loeffler v. Frank*, 486 U.S. 549, 557-58 (1988); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 412 (1975).[14]

The parties stipulated that Allen's Estate is owed $32,871.59 in back pay.[15] Accordingly, the court will grant the Estate $32,871.59 in back pay and pre-judgment interest calculated at the appropriate rate.

**Conclusion**

For the reasons above, the court will enter judgment in favor of Allen's Estate. A separate order follows.

\_\_\_\_Dec. 20, 2017_____ _____/s/_____
Date Catherine C. Blake
United States District Judge

---

[14] Remedies under the ADA mirror those available under Title VII. 42 U.S.C. § 12117(a).

[15] The County argues that Allen failed to mitigate his damages because he never re-applied for the position of correctional officer and he declined to undergo a second fitness for duty examination in 2012. Allen did not unreasonably deny these opportunities. As explained above, the County unconditionally removed Allen from his position as correctional officer and failed to reconsider after Allen pleaded for his job back. Accordingly, it is not unreasonable that Allen did not re-apply for his old job or submit to a discretionary fitness for duty examination—especially because he was not told that either might result in restoration of his position as a correctional officer.